## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NENA L. HORSLEY, | § | |
| Plaintiff, | § | |
| v. | § | No. 3:10-CV-02062-P (BF) |
| | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This is an appeal from the decision of the Commissioner of the Social Security Administration

("Commissioner") denying the claim of Nena L. Horsley ("Plaintiff") for Disability Insurance

Benefits ("DIB") under Title II of the Act.  The Court considered Plaintiff's brief (doc. 19), filed on

January 21, 2011, and Defendant's brief (doc. 20), filed on February 18, 2011.  The Court reviewed

the record in connection with the pleadings.  For the following reasons, the Court recommends that

the final decision of the Commissioner should be AFFIRMED.

## Background[1]

### Procedural History

Plaintiff filed an application for DIB on June 20, 2008.  (Tr. 14, 121-23.)  She alleged  a

disability onset date of August 29, 2007 because of bipolar disorder, major depressive disorder,

affective mood disorder, and hypertension.  (Tr. 14, 65-66.)

Plaintiff's application was denied on November 10, 2008, and again on February 20, 2009.

(Tr. 72-75, 77-80.)  Plaintiff requested a hearing on March 20, 2009, and that request was granted.

(Tr. 81-82.)  On September 21, 2009, an Administrative Law Judge ("ALJ") held the hearing at which

---

[1] The following background facts are taken from the transcript of the administrative
proceedings, which is designated as "Tr."

Plaintiff appeared and testified.  (Tr. 14, 27-64.)  She was represented by counsel, Sara Castle.  (*Id.*)  Additionally, a vocational expect ("VE"), Thomas R. Irons, was present at the hearing and testified.  (Tr. 52-64.)

**Plaintiff's Age, Education, and Work Experience**

At the time of her alleged onset date, Plaintiff was 39 years old.  (Tr. 139.)  She has a GED and took some college courses.  (*Id.*)  Plaintiff has past relevant work as a collection clerk, customer service representative, telephone representative, appointment clerk, telephone solicitor, and credit card processor.  (Tr. 21.)  The VE testified at the hearing that all her past relevant work was "semi-skilled" to "skilled" sedentary type work.  (Tr. 29-30.)

**Plaintiff's Medical Evidence**

On August 29, 2007, Plaintiff saw Dr. Joyce Hohn, her pulmonologist, regarding a follow-up for acute bronchitis.   At the appointment, Plaintiff reported experiencing new symptoms of depression, insomnia, tearfulness, and breathing difficulties when upset.  (Tr. 347-75.)  Plaintiff explained the symptoms began shortly after a client committed suicide.  Although not a mental health professional, Dr. Hohn diagnosed Plaintiff with situational depression and prescribed Lexapro and Ambien.  (*Id.*)  In follow-up visits, Plaintiff complained that the medication was not helping and she had ongoing symptoms of depression and a lack of interest in activities.  (*Id.*)  Dr. Hohn referred Plaintiff for a psychiatric evaluation with a mental health professional to address her depression.

Plaintiff underwent a psychiatric evaluation by Dr. Carmen Llauger-Mier at Dallas Metrocare Services ("Metrocare") on December 18, 2007.  During the evaluation, Plaintiff reported sadness, despondency, anhedonia, insomnia, irritability, poor hygiene, and anger.  (Tr. 212-17.)  Plaintiff told the doctor she was prescribed Lexapro for depression but she wasn't taking it anymore.  (Tr. 212.)

Dr. Llauger-Mier recorded that Plaintiff was adequately groomed; her behavior was cooperative; she exhibited signs of psychomotor retardation and pressured speech, but no psychotic features; and she had paranoid delusions and poor impulse control, but organized thought processes. (*Id.*) Plaintiff reported using alcohol to calm her nerves. (Tr. 215.) The doctor diagnosed Plaintiff with Bipolar Disorder and prescribed Valproic Acid and Wellbutrin. Dr. Llauger-Mier also advised Plaintiff not to drink socially. (Tr. 213.)

Plaintiff continued to seek treatment at Metrocare. In March 2008, Plaintiff reported angry outbursts and increased depression due to her mother's passing in January. She also stated her medication wasn't working so she was prescribed Lithium Carbonate instead of Valproic Acid. (Tr. 227-29.) During the summer of 2008, practitioners assigned to her case noted that Plaintiff continued to suffer from symptoms related to her Bipolar Disorder. On July 23, 2008, Plaintiff reported symptoms of sadness, despondency, anhedonia, insomnia, increased appetite, irritability, poor hygiene, anxiety, and outbursts of anger. (Tr. 235-39.) Practitioners recorded that Plaintiff was fairly groomed; had appropriate conversation; her insight and judgment were fair; and she was tearful throughout the interview. (Tr. 239.) Plaintiff was encouraged to engage in activities outside the home and exercise at least three times a week. (*Id.*) Medications were again adjusted to include a combination of Wellbutrin and Abilify, and later Wellbutrin and Tegretol.

Plaintiff was referred by the Commissioner for a psychiatric consultative examination with Dr. Lawrence Sloan on October 28, 2008. The doctor initially noted that Plaintiff was on-time for her appointment, appeared well-dressed and groomed, and she was calm and cooperative. (Tr. 249.) During the examination, Plaintiff reported that while her symptoms had somewhat improved, she still experienced fatigue, avolition, poor sustained concentration, difficulty sleeping, excessive appetite,

tearfulness, feelings of hopelessness, increased irritability, and anger.  (Tr. 249-54.)  Plaintiff

described her typical daily activities, such as taking her son to school, picking up the house, mowing

the yard, and taking out the trash.  (Tr. 250.)  She reported that she can groom herself, dress herself,

feed herself, shop for food, cook food, wash clothes, clean the house, pay bills, and drive around town

without getting lost.  (Tr. 250-51.)  Plaintiff told the doctor that for many years she would "drink

wine all the time because it relaxed" her.  (Tr. 251.)  She stated that intermittently, she would drink

2-3 bottles of wine a day, at maximum, and at least several glasses of wine per day prior to receiving

treatment.  Plaintiff denied alcoholism and stated that she quit drinking on a daily basis two years

ago.  She reported her most recent use of alcohol as a week prior to the examination.  (*Id.*)  For

Plaintiff's mental status, the doctor recorded no psychomotor retardation or agitation; logical and

appropriate thought processes; no hallucinations; depressed mood; intact memory, insight, and

judgment; alert and oriented cognition; and normal concentration.  (Tr. 252-53.)  Dr. Sloan diagnosed

Plaintiff with Major Depressive Disorder, recurrent and moderate, in lieu of Bipolar Disorder.  (Tr.

253.)  He assigned her a GAF score of 60.[2]

Between the months of September 2008 through July 2009, Plaintiff consistently failed to

show up for monthly mental health appointments at Metrocare.  (Tr. 279-81, 333, 339, 341, 346.)

On January 19, 2009, Plaintiff complained to the practitioners at Metrocare that her medications were

not working and that she was feeling depressed, irritable, and hearing "bugs in her ears."  (Tr. 294-

95.)  She reported sleeping well.  The doctor on duty noted that she continued to have "constricted

---

[2]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM).  A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See id.*

affect" but normal speech.  Plaintiff was taken off Wellbutrin and prescribed Lamictal in its place.

She also began taking Risperdal and continued with Ambien and Tegretol.  (*Id.*)

On April 7, 2009, Plaintiff saw Dr. Ikechukwu Ofomata at Metrocare for an evaluation.  She

reported symptoms of mania, depression, anxiety, and insomnia.  (Tr. 311.)  She also reported being

off her medications for one month.  (*Id.*)  She told the doctor she was drinking a whole bottle of wine

every other day to self-medicate and calm herself down.  (*Id.*)  Records indicate that Plaintiff had

"fleeting" suicidal ideation, but she denied intent or plan to commit suicide; no psychiatric

hospitalizations in the past two years; moderate difficulties in interacting with others and maintaining

responsibilities; moderate disturbance in activities such as sleep, eating, and sexual interest; moderate

inability to fulfill obligations such as job, school, or self; and low substance abuse.  (*Id.*)  Plaintiff

was assigned a GAF score of 45 with alcohol use.[3]

In June 2009, Plaintiff presented to Metrocare with complaints of severe mood swings, poor

sleep, crying spells, racing thoughts, and hearing voices about three times per week.  (Tr. 343-44.)

The practitioner on duty noted that Plaintiff exhibited a labile affect with an angry mood; fair

attention and decreased memory; good eye contact; alert and oriented; cooperative; and organized

thought processes.  (Tr. 344.)  Plaintiff's insight and judgment were measured as fair.  (*Id.*)

**Plaintiff's Testimony at the Hearing**

At the hearing, held on September 21, 2009, Plaintiff testified regarding her past work

experience as a collection clerk, customer service representative, telephone representative,

appointment clerk, telephone solicitor, substitute teacher, and credit card processor.  (Tr. 33-38; 52-

---

[3]  A GAF score of 41-50 indicates serious symptoms or serious difficulty in social, occupational, or school
functioning.  *See id.*

55.)  She stated that her last day of employment was August 29, 2007.  (Tr. 38.)  She quit working

after a client committed suicide and she began experiencing symptoms of depression.  (*Id.*)  Plaintiff

testified that when she first started treatment at Metrocare she wasn't taking baths and she didn't want

to be around anybody.  (Tr. 40-41.)  She also stated that, at that time, her mother moved in with her

so she could care for her.  (Tr. 41.)  Plaintiff testified to going off her prescribed medication because

she didn't like taking medication.  (Tr. 45.)  She said she was probably off her medication for about

three weeks.  (*Id.*)  Plaintiff testified that she has never been to inpatient psychiatric treatment and

August 2007 was the first time she had ever been prescribed medication for mental health treatment.

(Tr. 46.)

Plaintiff testified that she doesn't drink alcohol.  (Tr. 46.)  When asked by the ALJ when she

consumed her last drink, Plaintiff responded "[i]t's been a long time.  I can't think when."  (*Id.*)

Plaintiff stated that once she started going to Metrocare, the doctors told her not to drink and she

followed that advice.  (Tr. 46-48.)  Plaintiff testified that she hears bugs and voices in her ears

sometimes and she falls on occasion.  (Tr. 47-48.)

At the time of the hearing, Plaintiff testified that she takes baths, she does not have any

hobbies or interests, and she is still experiencing symptoms of depression.  (Tr. 43.)  She stated her

medications are Wellbutrin, Tegretol, Risperdal, and Ambien.  (Tr. 50.)  Plaintiff testified that she

can't concentrate and she doesn't drive "real, real far anymore".  (Tr. 51.)

**The Hearing**

A VE, Dr. Thomas Irons, also testified at the hearing.  He stated that he was familiar with

Plaintiff' past work experience and he heard her testimony at the hearing.  (Tr. 52.)  The ALJ

asked the VE to consider someone of Plaintiff's age, education, and work history with no

exertional limitations, but they cannot work in proximity to hazards, including driving, and they cannot work in temperature or weather extremes.  (Tr. 56.)  Further, this hypothetical person can have occasional contact with coworkers and supervisors, but only incidental contact with the public.  (*Id.*)  Their reasoning, math, and language would be 2-1-1.  (*Id.*)  When asked by the ALJ if that hypothetical person could perform Plaintiff's past work, the VE answered in the negative. (*Id.*)  Nonetheless, the VE testified that there is other work that person could do, such as an air purifier servicer, cleaner or housekeeping, and a marker.  (Tr. 56-57.)

**The Decision**

On December 23, 2009, the ALJ issued an unfavorable decision, finding Plaintiff not disabled. (Tr. 14-23.)  First, the ALJ observed that Plaintiff was insured for Title II DIB purposes through December 31, 2010.  (Tr. 14.)  Thus, the ALJ recognized that Plaintiff had to establish disability prior to December 31, 2010 to qualify for DIB.  (Tr. 14.)[4]

The ALJ analyzed the case pursuant to the familiar five-step sequential evaluation process.[5] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 29, 2007.  (Tr. 17.)  At step two, he found that Plaintiff's Major Depressive Disorder and Alcohol Abuse Disorder were medically-severe impairments.  (Tr. 17.)  At

---

[4]*See Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990); 42 U.S.C. §§ 416(i)(D), 423(c)(2)(A)(B)(i)(ii); 20 C.F.R. § 404.131.

[5]The five analytical steps involve (1) whether the claimant is performing "substantial gainful activity"; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.  "A finding that a claimant is disabled or not disabled at any point in the five-step process is conclusive and terminates the [Commissioner]'s analysis."  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

step three, the ALJ determined that Plaintiff's mental impairments, including her substance abuse, met Listings 12.04 (Affective Disorders) and 12.09 (Substance Abuse Disorders) for presumptive disability.  (Tr. 17-18.)

Once the ALJ found Plaintiff disabled, he went back through the steps under the assumption that Plaintiff had stopped her substance abuse.  (Tr. 18-19.)  At step two, the ALJ found Plaintiff's remaining impairment, Major Depressive Disorder, severe.  (*Id.*)  At step three, he found that Plaintiff's remaining impairments did not meet or equal the requirements of any Listed impairment, and thus, alcohol was a contributing factor material to the finding of disability.  (*Id.*)  Hence, Plaintiff could not be found disabled at step three.

Before proceeding to step four, the ALJ determined that Plaintiff's testimony and complaints were not fully credible.  (Tr. 20.)  The ALJ found that without Plaintiff's substance abuse, she retained the residual functional capacity ("RFC") to perform work at all exertional levels so long as there was no proximity to hazards, including driving; no exposure to temperature and weather extremes; no more than occasional contact with coworkers and supervisors; and only incidental contact with the public.  (Tr. 19.)

At step four, the ALJ determined that Plaintiff could not perform any of her past relevant work.  (Tr. 21.)  At step five, the ALJ found that Plaintiff retained the ability to perform other work existing in significant numbers in the national economy.  (Tr. 22.)  Relying on the testimony of the VE, the ALJ found that Plaintiff could perform the jobs of air purifier servicer, cleaner/housekeeper, and a marker.  (Tr. 22.)

**Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*.  Once the claimant satisfies his

burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

## Issues

1. Whether the ALJ's determination that Plaintiff met Listing 12.09 is supported by substantial evidence.

2. Whether the ALJ's decision to bar Plaintiff from receiving benefits is supported by substantial evidence.

## Analysis

### Listing 12.09

Plaintiff first contends that the ALJ's determination that Plaintiff met Listing 12.09 is not supported by substantial evidence. (Pl. Br. at 6.) Listing 12.09 provides, in relevant part, that a

claimant will meet the listing if there is evidence of "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. The required level of severity for these disorders is met when the requirements in any of the following . . . are satisfied . . . [d]epressive syndrome . . . [e]valuate under 12.04." 20 CFR Part 404, Subpart P, Appendix 1. Specifically, Plaintiff argues that the record does not support her "regular use" of substances, and thus, Plaintiff does not meet the listing. (Pl. Br. at 7.)

The medical record reflects numerous occasions wherein Plaintiff reported her use of alcohol. The first indication of Plaintiff's alcohol abuse is in the Metrocare records dated December 18, 2007. (Tr. 215.) The notation in the comments section of that record states "client reports using alcohol to calm her nerves." (*Id.*) Subsequently, in a mental status examination performed by Dr. Sloan, Plaintiff told the doctor that for many years she would "drink wine all the time because it relaxed" her. (Tr. 251.) She further stated that "[s]he would drink 2-3 bottles of wine a day, intermittently at maximum, and at least several glasses of wine per day for many years prior to receiving treatment." (*Id.*) Plaintiff also told Dr. Sloan that she stopped drinking on a daily basis two years ago, but reported her most recent use of alcohol as a week prior to the examination. (*Id.*) The examination was completed on October 28, 2008. (Tr. 249.) Finally, and most concerning, are the Metrocare records dated April 7, 2009, that indicate Plaintiff "reports drinking every other day, self medicate '[i]t calms me down' to go to sleep, whole bottle of wine." (Tr. 311.) Contrary to Plaintiff's argument, the record reflects regular use of alcohol that extends over the entire relevant time period for the decision.[6]

---

[6] The relevant time period is Plaintiff's date of onset, August 29, 2007, through the date of the decision, December 23, 2009.

11

Plaintiff further argues that none of the doctors diagnosed Plaintiff with an alcohol related impairment, and Plaintiff's own testimony at the hearing supports her argument. However, the only doctor who completed a form that included substance addition disorders as a category for diagnosis was Dr. Mehdi Sharifian. Dr. Sharifian completed a psychiatric review technique on November 5, 2008 wherein he indicated Plaintiff had 12.04 affective disorder but not 12.09 substance addition disorder. (Tr. 255-268.) Nevertheless, the doctor only reviewed Plaintiff's medical records up to November 5, 2008, and thus, did not review the Metrocare records where Plaintiff reported drinking heavily again. (Tr. 255.) The Court is unable to say what the doctor would have diagnosed had he reviewed all of the evidence.

Furthermore, it appears from Plaintiff's testimony at the hearing that Plaintiff may have tried to minimize her drinking, not only to the ALJ but possibly to her doctors as well. At the hearing, held on September 21, 2009, Plaintiff testified that she could not remember the last time she drank alcohol. (Tr. 46.) However, just five months prior, Plaintiff had reported to the doctors at Metrocare drinking a bottle of wine every other day to self-medicate. (Tr. 311.) Even Plaintiff's lawyer, at the hearing, recognized her alcohol abuse as being "a big issue in the beginning". (Tr. 48.) Plaintiff stated that the doctors at Metrocare told her she can't drink with her medication and so she followed that advice. (*Id.*) Nonetheless, the Court again points out that Plaintiff was still drinking large quantities of alcohol in April 2009, roughly a year and a half after she began treatment at Metrocare. The ALJ's determination that Plaintiff's testimony at the hearing was not entirely credible is supported by substantial evidence.

The Court also finds that there is substantial evidence in the medical records to support the ALJ's determination that Plaintiff met Listing 12.09.

12

**Substance Abuse**

In a somewhat related argument, Plaintiff essentially contends that substantial evidence does not support the ALJ's determination that alcohol was a contributing factor material to the finding of Plaintiff's disability. (Pl. Br. at 8.) Public Law 104-121 eliminated alcoholism, and drug addiction, as a basis for obtaining disability benefits. *See* Pub. L. No. 104-121, §105, 110 Stat. 847, 852-855 (1996) (amending 42 U.S.C. §§423(d)(2)(C) and 1382(c)). Thus, if an ALJ makes a determination of disability, and there is evidence of substance abuse, the ALJ must determine whether the substance abuse is a contributing factor material to the disability determination. 20 C.F.R. §404.1535(a). If the substance abuse is a contributing factor material to the determination of disability, the claimant will not be found disabled. *See id.*

The key factor an ALJ examines when determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether a claimant is still disabled absent the use of drugs or alcohol. 20 C.F.R. §404.1535(b). The regulations require the ALJ to evaluate which physical or mental limitations would remain if the claimant discontinued her substance abuse and determine whether those limitations would still be disabling. *See id.* If the claimant's remaining limitations are not disabling, drug and alcohol abuse is deemed a contributing factor material to the disability determination and the claimant cannot receive benefits. *See id.* The burden is on the claimant to prove that her remaining impairments are disabling absent drug and alcohol abuse. *See Brown v. Apfel,* 192 F.3d 492, 498 (5th. Cir. 1987).

Here, the ALJ found Plaintiff disabled at step 3, but also found there was medical evidence of alcoholism.[7]  (Tr. 18.)  Thus, the ALJ examined Plaintiff's physical and mental limitations that remained without Plaintiff's use of alcohol.  The ALJ looked at the four functional areas, known as the paragraph "B" criteria, set out in the regulations for evaluating mental disorders.  *See* 20 C.F.R., Part 404, Subpart P, Appendix 1.  The ALJ found that Plaintiff would have mild restrictions in daily living activities if Plaintiff discontinued her use of alcohol.  (Tr. 18.)  The ALJ explained that Dr. Sloan's records show Plaintiff indicated she can care for her personal needs, including bathing and dressing, and she performs household chores, mows the yard, and takes out the trash.  (Tr. 249-253.) The ALJ found that Plaintiff would be moderately limited in the areas of social functioning and concentration, persistence, and pace without her use of alcohol.  (Tr. 18-19.)  Plaintiff told Dr. Sloan that she enjoys attending her son's football games and that she is able to drive around town without getting lost, go grocery shopping, and pay her own bills.  (Tr. 249-253.)  Dr. Sloan noted in the consultative examination that Plaintiff's concentration was within the normal limits, she was able to spell the word "world" backwards, and she responded to all questions asked of her.  (*Id.*)  For the last category, the ALJ found that Plaintiff would have no episodes of decompensation if her alcohol abuse stopped.  (Tr. 19.)

---

[7]  Plaintiff again makes the argument that the medical record only demonstrates periodic use of alcohol and not regular use.  (Pl. Br. at 9-10.)  However, for the reasons stated above, the Court finds that there is substantial evidence of Plaintiff's alcoholism.  The Court notes that Plaintiff argues that there is no mention of alcohol in Dr. Hohn's treatment records from August 2007 through December 2007.  (Pl. Br. at 9.)  Nonetheless, when Plaintiff sought care at Metrocare on December 18, 2007, she admitted to drinking alcohol to help calm her nerves.  (Tr. 215.)  The Court further notes that the first mention of alcohol was December 18, 2007 and not December 18, 2008, as Plaintiff argues in her brief.  (*See* Pl. Br. at 9; Tr. 215.)

The ALJ's findings in the Paragraph "B" criteria coincide with the degree of limitation that Dr. Sharifian assessed in his psychiatric review technique. (*See* Tr. 265.)  The Court finds this particularly persuasive since Dr. Sharifian's assessment was performed based upon his diagnosis of Bipolar Disorder, and not a substance abuse disorder.  (Tr. 255-268.)  Furthermore, the ALJ's findings also parallel Dr. Ofomata's assessment of Plaintiff's functional impairments, wherein he stated she was moderately limited in activities, responsibilities, obligations, and interaction with others. (*See* Tr. 311.)

In order to meet any of the 12.00 Listings for mental disorders, and thus be found disabled at step 3, there must be at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation found in the paragraph "B" criteria.  *See* 20 C.F.R., Part 404, Subpart P, Appendix 1.  Since the ALJ found no "marked" limitations and no episodes of decompensation, without Plaintiff's alcohol abuse, Plaintiff cannot be found disabled at step 3.  Since Plaintiff's remaining limitations are not disabling, the ALJ properly concluded that alcohol was a contributing factor material to Plaintiff's disability determination.  Plaintiff failed to meet her burden.  As such, Plaintiff cannot be found disabled.[8]

---

[8] The Court notes that along with Plaintiff's brief, Plaintiff submitted a letter from the Commissioner stating that Plaintiff was approved for DIB, and that she became disabled on June 16, 2010.  (Pl. Br., Ex. 1.)  This letter was in response to Plaintiff's second application for DIB. (Pl. Br. at 2.)  This later finding of disability has no effect on the present decision because (1) the ALJ made his decision on December 23, 2009, and thus, the relevant time period ended six months prior to June 16, 2010; and (2) as Plaintiff states in her brief "due to a worsening of Ms. Horsley's medical condition after the hearing decision, counsel filed a second application . . ." (*Id.*)  The Court is unable to review Plaintiff's condition after the ALJ's decision of December 23, 2009.

**<u>Recommendation</u>**

Because the Court finds that substantial evidence exists to support the ALJ's determination that Plaintiff is not disabled, the Court recommends that the District Court AFFIRM the Commissioner's decision and dismiss Plaintiff's Complaint with prejudice.

SO RECOMMENDED, February 28, 2012.


_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

16

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within fourteen days after service.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).